Ranney, J.
The questions presented in this case arise upon a demurrer to the plaintiff’s declaration. The importance of the case to the parties, the large amount involved, and the difficult application of the principles upon which its decision depends, fully justify the very elaborate examination given it by counsel.
On the 31st of December, a. d. 1849, the canal fund commissioner of the state drew from the treasury, of money belonging to the state, and applicable to the payment of its indebtedness becoming 314] due in the city of New York on the *first of January, 1852, and delivered to the Columbus Insurance Company, one hundred thousand dollars, taking from the insurance company a bond of that date, by which, after reciting that that sum had been deposited by the commissioners with that company, the company, for value received, promised to pay the amount, with seven per cent, interest thereon, on the 28th day of December, 1851, at the office of the Ohio Life Insurance and Trust Company, in the city of New York, or at such other place in New York city as said commissioners might direct, with the privilege of paying the whole, or any part of the amount, in the seven per cent, stocks of the state at par. At the same time, and as a part of the same transaction, the defendant’s testator, with others,' executed and delivered to the commissioners a separate bond, binding themselves that the insurance company should pay the amount, with interest, at the time it fell due, or, in default, that they would pay it. The declaration avers that the sum was deposited with the company, “ with a view to the redemption of a portion of the seven per cent, stock of the state of Ohio, and to the increase and advancement of the canal fund, at the instance and request of Joel Buttles and others named,” and “ to he transmitted by said insurance company to the city of New *315 York, and there to be paid to said fund commissioners, in money or in seven per cent, stock of the State of Ohio at par.”
In support of the demurrer, it is claimed:
1. That the transaction was, in substance and legal effect, a loan of the public moneys, which the fund commissioners were not only not authorized by law to make, but were expressly prohibited from doing so, and made liable to indictment and punishment for doing it.
2. That this transaction being a loan of money not only not authorized, but expressly prohibited by statute, the instrument set out in the declaration, on grounds of public policy, is illegal and void; and no action can be sustained on it in a court of justice.
*3. If it should not be held a loan, but a deposit (which it is [315 conceded the commissioners might lawfully make), it is still objected that the instrument is illegal and void, because the insurance company had no corporate power to receive money on deposit, or to engage in the business of exchange.
I. We can entertain no doubt that the money advanced to the insurance company was, in substance, and legal effect, a loan, which, upon its face, established the relation of lender and borrower between the state and the company. The instrument, it is true, ! recites that the sum has been deposited with the insurance company, and that it is to be repaid as specified in other parts of the bond. But the whole instrument, taken together, most clearly shows that it was to, and did, become the money of the company, and constitutes the “value received,’-’ for which the company undertook to pay the sum of one hundred thousand dollars two years thence, with interest.
The fund could not be withdrawn at the will of the state; it was not placed with the company for safe keeping, or transmission; but the clear and manifest object was to enable the company to obtain the use of the money for a long period of time, to be used, controlled, and treated as its own, and the state to derive a profit from its use.
The authorities are united in treating such a transaction as a loan upon interest: Commercial Bank of Albany v. Hughes, 17 Wend. 100; Bank of Orleans v. Morrill, 2 Hill, 295; Leavitt v. Palmer, 3 Conn. 35 ; Southern Loan Company v. Morris, 2 Barr, 175.
Had the commissioners power to make the loan? Upon this question a large number of statutes, extending from 1825 to 1846 *316, 317 have been referred to, and commented upon at length by counsel. It is unnecessary for us to examine them in detail. We have carefully read them all, and are entirely satisfied that tire policy of the state has always been, what we have no hesitation in saying it should have been, to prohibit its officers and agents from loaning 316] or dealing in its *funds, either on public or private account. A. few exceptions, when they have been authorized by special statutes to loan or otherwise improve particular funds, only make the general rule the more manifest. The act of 1825 (Chase Stat. 1472), while it gave to the commissioners the most ample power in relation to obtaining loans, paying interest, depositing and transferring funds, contains this significant provision: “ They [the commissioners] shall recommend, from time to time, to the legislature, the adoption of such measures, as they may think proper for the improvement of said fund.” Nothing could show more clearly the fixed purpose of the general assembly to- reserve to itself the exclusive power of determining whether any portion of the fund should be loaned or invested. The commissioners were only to recommend measures for legislative action; not to attempt to improve the fund, without express authority given by that body.
But it is quite immaterial what might have been the state of legislation prior to 1840. The act of March 23, of that year, “to regulate the receipts and disbursements of the canal fund,” which repeals all prior laws inconsistent with its provisions, very carefully provides for paying into the state treasury, all moneys belonging to that fund as they are received, and, except the portion applicable to the sinking fund, expressly prohibits their being drawn from the treasury until they are needed to pay the liabilities of the state; while the 15th section of the act of March 10,1843, to reorganizo the board of canal fund commissioners, provides, that they shall act as commissioners of the sinking fund, “and shall, from time to time, apply all moneys accruing to the credit of said fund to the purchase of, or investment in, the public debt of this state, and to no other use or purpose whatever
The act of March 2, 1846, “ to prescribe the duties of the board of public works, canal fund commissioners, etc-.,” after requiring sundry duties to be performed by the auditor and treasurer of state, 317] in the 6th section provides, that all *“ revenues appropriated by law to the canal fund, or to the interest fund, shall be carried by the state auditor to the credit of the interest fund, and shall be *318 paid by tbe state treasurer, on tbe warrant of the auditor, to the commissioners of the canal fund, and shall be, by said commissioners, applied to the payment of interest on the public debts of the state, and for no other use or purpose.”
On the same day was passed an act “ to punish the embezzlement of public moneys, and for other purposes.”
The first section subjects to the penalties prescribed by law for feloniously stealing property, any officer appointed or elected under the constitution or laws of the state, or any agent or servant of the state, who should convert to his own use, or use by way of investment in property or merchandise, or make way with or secrete, any money or valuable security received for safe keeping, disbursement, transfer, or other purpose, which might be in his possession, or over which he might have supervision, care, or control, by virtue of his office or agency.
The second section inflicts a fine of not less than $50, or more than $500, and a forfeiture of office, and incapacity to hold office for five years, upon any “ such officer, agent, or servant,” who should “ loan out, with or without interest, any money or valuable security received by him, or which may be in his possession or keeping, or over which he may have supervision, care, or control, by virtue of his office, agency, or service.”
The third section avoids every agreement made by any such officer, agent, or servant, by which he is to derive any advantage or benefit from deposits made by him, and provides that they shall inure to the benefit of the state; while the fourth section inflicts a penalty upon the officer or agent who shall make any such contract or agreement.
From this hasty and very imperfect sketch of the most material parts of the legislation brought to our notice, in force when this-contract was made, we are of opinion that there was then no authority given to the fund commissioners *to loan any portion [318 of the public moneys placed under their control; but on the contrary, they were expressly, prohibited from doing so; and for a violation of their duty in this particular were subjected to the penalties provided in the second section of the act of 1846.
We have attentively considered the argument advanced by the plaintiff’s counsel, that this section was only intended to apply to cases in which the officer corruptly, and without any purpoée to serve the interests of the public, loans the public moneys intrusted *319 to his beeping, for his own benefit or advantage, or that of his friends; and not to loans made by an officer in good faith for the public benefit. But no such qualifications are found in the section; and to interpolate them would be, in our opinion, to subvert the very policy the general assembly was laboring to establish.
They had again and again provided that the public moneys should remain in the treasury until they were required to pay the public creditors; except such of them as belonged to the sinking fund; and they were only permitted to be drawn from there to be placed in the public stocks. The officer was invested with no discretion to determine that the public interests would be promoted by using them for purposes not provided by law. It was t,o keep them where they,belonged that this additional safeguard was provided, and it needs but very little experience to discover its wisdom'.
"We quite agree that the first section only reaches a conversion to the private use of the officer, and for that subjects him to infamous punishment; while the third and fourth clearly imply the lawful right of the officer to deposit the public money when necessary in the discharge of his official duties, and only punish the ¡abuse of the privilege when he endeavors to secure some benefit or .advantage to himself. In our view the second section has its own ■distinct objects, ends, and aims; which are enforced, not by such ¡infamous punishment as very properly attaches to a corrupt conversion of the funds to the private use of the officer, but such 1319] *as appropriately follows official delinquency and breach of ■public trust in a way to endanger their safety. It seems to us that the language and purpose of the section are both disregarded when it is taken for anything less than an absolute prohibition to ¡every officer, agent, or servant of the state, having public moneys iin his hands, or under his control, to loan them out, either on private or public account without express authority of law.
II. It follows from these conclusions that the loan made in this ¡case was wholly unauthorized, and that the state was not, at the time the contract was made, bound by it. Whether she could lawfully make herself a party to it "and claim the benefit of its provisions, and whether she has actually done so, are entirely different •questions.
We agree that she can only do so upon the same terms, and subject to the same restrictions as a private individual. When she ¡appears as a suitor in her courts to enforce her rights of property, *320 she comes shorn of her attributes of sovereignty, and as a body politic, capable of contracting, suing, and holding property; is subject to those rules of justice and right, which, in her sovereign character, she has prescribed for the government of her people.
If she makes herself a party to the contract of her unauthorized agent by ratifying his acts, she must take the contract as he has made it, and stand by all its provisions. If its inherent vices are such as to prevent its being enforced for an individual, it can not be enforced for her. Whether this contract is of that character, we now proceed to inquire, assuming for this purpose that it has been ratified by the state.
The assumption that it is, is founded upon a very ancient and very important maxim of the common law, ex turpi causa, non oritur actio. As illustrated in the multitude of cases collected with great industry by counsel, it denies the right to recover upon any contract of which the consideration or obligations to be performed are contra bonos mores, forbidden by positive law, or opposed to public policy. As forcibly said by Chief Justice Wilmot, in [320 Collins v. Blantern, 2 Wils. 341: “You shall not stipulate for iniquity. All writers upon our law agree in this, no polluted hand shall touch the pure fountains of justice.”
It would, indeed, be a gross absurdity that the government, through its courts, should aid in the subversion of its own policy; assault those principles of virtue and morality it is created to uphold ; or itself overthrow the law which it compels others to observe, and which it was made to enforce.
In every executory contract two things are to be observed; the consideration paid or advanced, and the promise founded upon it. If any part of the consideration given is illegal or immoral, the whole contract is void, because the illegal, as well as the legal part of the consideration, has inseparably entered into and formed the inducement upon which all the undertakings of the other party are founded. If the consideration is legal, and a part only of what is agreed to be done is illegal, and that may be separated from the balance, the contract may have effect, and be enforced for everything but the illegal stipulations.
In this case the consideration of the contract was money, and the promise of the defendant’s testator was to repay it with interest. It was lent and borrowed, so far as we know, to be applied to a lawful purpose. Aside from any statutory prohibition, it would not be *321 thought either illegal or immoral for the state or an individual to lend money upon interest; nor would it be supposed a violation of either law or morals for the individual who borrowed it to pay it as he ’had agreed. The whole question, therefore, depends upon the construction to be put upon our statutes prohibiting the agents of the state from lending its money. There is nothing in any of them, we concede, to induce the belief that any relaxation from the full effect of this salutary maxim was intended. But the maxim itself has its limits; lying, too, so near the limits of other principles leading to different results, that like the blending of colors, it is often difficult to separate them; and in many cases quite impos321] sible without ^careful attention to the spirit and purpose with which it was established.
It certainly can not be applied to annul contracts made by an agent in the name of his principal, without authority or in direct disobedience to the orders of his principal; as that would overturn another principle equally ancient and-well established, that the principal may subsequently ratify such unauthorized acts of his agent, and be entitled to all the benefits and incur all the obligations of the contract, “ as fully to all intents and purposes as if he had originally-given him direct authority in the premises, to the extent which such acts, doings, or omissions reach.” Omnis ratihabitio retrotrahitur et mandato priori cequiparatur. Story on Ag., sec. 239.
What object, then, was intended to be accomplished by these statutes, and particularly the 2d section of the act of 1846 ? To determine this, the whole statute must be considered, and the intention of the legislature discovered. In Harris v. Runnels, 12 How. 84, the court say: “ We have- concluded, before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and penalty, or a penalty only for doing a thing it forbids, that the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so.” This was said in a case where both the maker and payee of the note in suit had incurred the penalty of a statute of the State of Mississippi, for selling and buying a slave brought into the state in violation of its provisions, and yet the obligation was enforced.
Applying the doctrine to these statutes, we have no difficulty in *322, 323 saying that their whole object, spirit, and design, is preserved when they are made operative between the state and its agents, in deterring the latter from the interdicted use of the public moneys; and that upon no fair construction can they be held to operate uj on the unauthorized contract *so as to prevent the state [322 from claiming the benefit of its provisions, should she deem that the most feasible mode of replenishing the public treasury- Unwilling to trust the agents of the state, the legislature has seen fit to deny them, the power to loan the public funds, and, the better to secure obedience, has prescribed penalties for the transgression of its instructions. But the state, through its legislative department, is nowhere prohibited from doing it. The agent can not do it for the principal, but the principal can do it for itself and make a perfect lawful contract, neither prohibited by law nor immoral in its tendency or effects. Now, who are the parties to 'this contract? Plainly, the state on the one part, and the defendant and his associates on the other. They are all competent to contract, and have contracted upon a lawful subject-matter, neither injurious to the public morals nor prohibited by any law. The one has lent money, and the other has borrowed and agreed to repay it; and this is the contract we are called upon to enforce, and these are the parties before us. We have no right to look beyond them; their rights are alone involved in this controversy, When the agents of the state exceeded their authority, the state had its option to ratify their acts or repudiate the contract they had made in its name; but when it elected to ratify, it assumed all the obligations of the contract from its reception, and was entitled to all its benefits. If the state could have lawfully made the contract at the time and under the circumstances it was made, it could lawfully adopt the one made in its name by those who assumed to act as its agents. If she could not lawfully have made it without the intervention of an agent, she could not lawfully adopt one made by an agent, either with or without authority. It was her interest in her own money that she designed to. protect by the restrictions placed upon her agents, and not the public morals ; and she had a perfect right to waive the wrong committed upon herself, and adopt the contract made in her name, with all the rights that it conferred. If, when ^adopted, the consideration upon which it was made, [323 or its performance by the other party, is found to be illegal or immora*, it will no sooner be enforced for her than for the most ob *324 scure citizen; but if it then stands without objection in both these particulars, it is no defense to say she was wronged by her agents, when they assumed, without authority, to act in her name. That is a matter between her and her agents; the option whether she will make herself a party to their acts, and bo bound by the contract they have made, belongs to her, and not to those who have not and could not have been injured.
In short, any contract that an individual, or body corporate or politic, may lawfully make, they may lawfully ratify and adopt, when made in their name without authority; and when adopted, it has its effect from the time it was made, and the same effect as though no agent had intervened. The state could lawfully have loaned this money, and the defendant’s testator could lawfully have bound himself to repay it. If the contract has been ratified and adopted by the state, in judgment of law the state did loan the money, and the defendant’s testator did promise the state to repay it.
III. Has the state ratified the contract ? Upon this demurrer we are bound to say that it has. The state is a party to the record, suing upon the contract, without any suggestion that the suit is prosecuted without authority. It has long been settled that this would be deemed sufficient evidence of ratification in the case of an individual; and we know of no reason why the state is not entitled to the benefit of the same presumption. Differences no doubt exist between the ratification of a contract by the state and an individual; but this is not one of them.
It is proper, however; we should say, that this contract could have been ratified only by the general assembly. That body alone had power to have made the loan, at the time it was made, and to have bound the state by the contract; and the ratification of a con-324] tract already made, requires no *less power. No officer or agent could have done it, because no officer or agent could have made the contract. They were not only without authority, but expressly prohibited. "Without the intervention of legislative discretion, it can not be told whether it was for the interest of the state to ratify it. The moment it was ratified, it is perfectly settled the state lost all remedy against its unfaithful.agents. Story on Ag., sec. 243.
This remedy could not be released, or the benefits of the contract acquired, without the action, in some way, of that department of the government, having power under the constitution, to dispose *325 of the property of the state. This was settled, upon much consideration, in the case of The State of Illinois v. Delafield, 2 Hill, 159.
If it could only be ratified by a public law, of which we, could take judicial notice, wo should now be bound to declare whether the contract had ever taken effect. But, without undertaking to determine what action of the legislative body might be sufficient for the purpose, we are of opinion that it might be ratified in other ways than by such law; the evidence of which may be contained in the journals of the two houses, of which, it is well settled, we can not take notice. 1 Greenl. Ev. 6.
On the whole case, therefore, we are of opinion that the transaction with the insurance company was a loan, within the meaning of the second section of the act of 1846, which the fund commissioners had no power whatever to make, and for which they became liable to the penalties therein prescribed. But the state, through its legislative department, had power to make such a contract; and just as ample power to ratify one already made without authority. On this demurrer we are bound to suppose it has ratified this contract ; and if it has, the contract has taken effect between parties under no legal impediment to contract, upon a money consideration, and requires nothing to be done in its performance in violation of any law, or of public morals. It does not arise, therefore, ex turpi causa; but the whole case depends upon the law of agency, and the right of a principal *to ratify the unauthorized acts [325 of an agent. The statute spends its whole force back of the contract, and can not be held to affect it, without coming to the unwarrantable conclusion, that in addition to punishing the unfaithful agent for a wrong done to the state, the legislature intended to do what they could to prevent the' state from obtaining redress from those who had combined with its agent and enjoyed the fruits of his unlawful conduct.
As this was a loan, it is unnecessary to refer to the powers of the corporation to receive deposits, since it is not doubted it had full power to borrow money.
The demurrer must be overruled, and the cause remanded to the district court for further proceedings.